PER CURIAM.
Joel Diaz appeals two orders of the Twentieth Judicial Circuit Court denying his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851 and his motion seeking a ruling that he is ineligible to be executed due to mental retardation under Florida Rule of Criminal Procedure 3.203. Diaz also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below, we affirm the postconviction court’s orders and deny Diaz’s habeas petition.
I. BACKGROUND
On direct appeal, this Court set out the following facts summarizing Diaz’s crimes:
Diaz and Lissa Shaw dated for about two years. During the second year of their relationship, they lived in Diaz’s home with Lissa’s young daughter. The relationship proved “rocky,” however, and around August 1997 Lissa moved in with her parents, Charles and Barbara Shaw. After she moved out, Diaz tried to *100 see her, but she refused all contact. The two last spoke to each other in September 1997.
On October 6, Diaz purchased a Rossi .38 special revolver from a local pawn shop. He was eager to buy the gun, but because of a mandatory three-day waiting period, could not take it with him. Three days later, Diaz returned to the pawn shop to retrieve the gun, but it could not be released to him because his background check remained pending. Diaz was irritated, and continued to call the shop nearly every day until he was cleared. On October 16, Diaz finally was allowed to take the gun.
On October 27, Diaz asked his brother Jose, who was living with him at the time, for a ride to a friend’s house the next morning. Sometime that night or early the next morning, Diaz wrote a letter to his brother, which the police later discovered in his bedroom. It reads:
Jose [fjirst I want to apologize for using you or to being to you to take me where you did I felt so bad but there was no other way. Theres no way to explain what I have to do but I have to confront the woman who betrayed me and ask her why because not knowing is literly [sic] killing me. What happens then is up to her.
If what happen is what I predict than I want you to tell our family that I love them so much. Believe me I regret having to do this and dieing knowing I broke my moms heart and my makes it even harder but I cant go on like this it’s to much pain. Well I guess that all theres to say I love you all.
Joel
P.S. Someone let my dad know just because we werent close doesn’t mean I don’t love him because I do.
At 5:30 a.m. on October 28, Diaz’s brother and his brother’s girlfriend drove him to the entrance of the Cross Creek Estates subdivision, where the Shaws lived. Diaz carried his new gun, which was loaded, and replacement ammunition in his pocket. Diaz walked to the Shaws’ house and waited outside for about ten minutes.
At 6:30 a.m., Lissa Shaw left for work. She entered her car, which was parked in the garage, started the engine, and remotely opened the garage door. She saw someone slip under the garage door, and when she turned, Diaz stood at her window, pointing the gun at her head. He told her to get out of the car. She pleaded with him not to hurt her. When she saw that “the situation was not going anywhere,” she told him, “Okay, okay, hold on a second, let me get my stuff,” and leaned down as if retrieving personal items. She then shoved the gear into reverse and stepped on the gas pedal. Diaz started shooting. Lissa heard three shots, but did not realize she had been hit. As she continued backing out, the car struck an island behind the driveway. She then put the car into forward drive. As she drove away, she saw Diaz in the front yard pointing the gun at her father, Charles Shaw. Charles was about five feet from Diaz, pointing and walking toward him. Lissa drove herself to the hospital where it was discovered she had been shot in the neck and shoulder.
Charles and Diaz then had some sort of confrontation in the front yard and an altercation in the garage, resulting in Diaz chasing Charles into the master bedroom where Barbara was lying in bed. A quadriplegic, Barbara could not move from the bed.
As the two men moved through the house, Barbara heard Charles saying, *101 “Calm down, put it down, come on, calm down, take it easy.” Barbara was able to roll back to see Diaz standing in the bedroom with a gun. He was standing on one side of a chest of drawers, closer to the door, while Charles was standing on the other side of the chest, closer to the bathroom. Charles talked to Diaz, telling him to calm down and put down the gun. Diaz held the gun with two hands, pointing it straight at Charles, about six to eight inches from Charles’s chest. Diaz pulled the trigger, but the gun, out of ammunition, only clicked. Charles visibly relaxed, but Diaz reloaded the gun. When Charles realized Diaz was reloading, he ran into the bathroom. Diaz followed. As Charles turned to face him, Diaz fired three shots. Charles’s knees buckled, and he grabbed his midsection and fell face first to the floor.
Diaz went back into the bedroom and stood beside Barbara, holding the gun. Barbara screamed, “Why did you do this?” Diaz answered that Charles deserved to die. He stood in the bedroom from 30 seconds to a minute, then returned to the bathroom, bent over Charles’s body, extended his right arm, and shot Charles again. He then moved his arm left, which Barbara judged to be toward Charles’s head, and shot again. Diaz returned to the bedroom and, according to Barbara, said, “If that bitch of a daughter of yours, if I could have got her, I wouldn’t have had to kill your husband.”
Diaz remained in the house between 45 minutes and an hour. He spent some of this time talking to Barbara in the bedroom, where he passed the gun from hand to hand and unloaded and loaded the gun about three or four times. He remained in the house until the police arrived and arrested him.[N.1]
Diaz v. State, 860 So.2d 960, 963-64 (Fla.2003).
Diaz’s defense counsel at trial argued that Diaz was insane at the time of the crime and even if he was not insane, he still lacked premeditation in killing Charles Shaw. The defense presented the testimony and report of Dr. Paul Kling in support of its contention that Diaz was insane at the time of the crime. The defense further argued that the lay witness testimony regarding Diaz’s behavior indicated that he was insane and impulsive. The defense also argued that Diaz lacked premeditation in killing Charles Shaw because Diaz shot him during the course of a confrontation.
The jury convicted Diaz of “the first-degree murder of Charles Shaw, the attempted first-degree murder of Lissa Shaw, and aggravated assault with a firearm on the neighbor.” Id. at 964. The jury recommended a sentence of death by a vote of nine to three following the penalty phase. Id. After conducting a Spencer[1] hearing, the trial court sentenced Diaz to death. Id. The trial court found three aggravating factors and afforded great weight to each of them: (1) the capital felony was especially heinous, atrocious, or cruel (HAC); (2) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of *102 moral or legal justification (CCP); and (3) the defendant was previously convicted of another capital felony or of a felony involving use or threat of violence to the person. State v. Diaz, No. 97-3305 (Fla. 20th Cir. Ct. sentencing order filed Jan. 29, 2001) (Sentencing Order) at 2-8. The trial court found the following statutory mitigating circumstances: (1) the defendant had no significant history of prior criminal activity (very little weight); (2) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance (moderate weight); and (3) the age of the defendant at the time of the crime (moderate weight). The trial court determined that it was “not proven” that Diaz’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired and afforded that factor “very little weight.” The trial court also found the following nonstatutory mitigating circumstances: (1) the defendant was remorseful (very little weight); and (2) the defendant’s family history of violence (moderate weight). Sentencing Order at 8-12.
Diaz raised four claims on direct appeal: (1) the “circumstantial evidence corroborates his testimony that he lost control after Charles Shaw struck him in the face” during an altercation; (2) “the trial court erred in finding and instructing the jury on the HAC aggravating factor;” (3) “the trial court erred in finding and instructing the jury on the CCP aggravating factor;” and (4) his death sentence is disproportionate. Diaz, 860 So.2d at 965. This Court agreed with Diaz that the trial court erred in finding the HAC aggravating factor; however, the Court concluded that the error was harmless. Id. at 968. This Court rejected Diaz’s remaining claims and affirmed his conviction for first-degree murder and sentence of death. Id. at 971.
II. MOTIONS FOR POSTCONVICTION RELIEF
In April 2005, Diaz filed a motion for postconviction relief pursuant to rules 3.850 and 3.851 of the Florida Rules of Criminal Procedure. Following years of public records litigation, he filed an amended motion in July 2009. Diaz raised fifteen claims in his amended motion, alleging numerous violations of his constitutional rights.
Diaz raised the following claims before the postconviction court: (1) section 119.19, Florida Statutes (2000), and Florida Rule of Criminal Procedure 3.852 are unconstitutional because his access to public records has been withheld; (2) Florida Rule of Criminal Procedure 3.851 unconstitutionally violates his equal protection and due process rights by requiring him to file his postconviction motion within one year of his conviction and sentence becoming final; (3) juror misconduct rendered his trial and sentence unreliable, in violation of his due process rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); (4) Florida Rule of Professional Responsibility 4-3.5(d)(4) is unconstitutional; (5) his death sentence was a result of racial discrimination; (6) he was unconstitutionally denied a jury of his peers because the venire panel was not from a fair cross section of the community, and trial counsel were ineffective for not questioning jurors during voir dire about their racial biases; (7) trial counsel were ineffective during the guilt phase of his trial for numerous reasons; (8) he was denied a fair trial due to prosecutorial misconduct; (9) he was denied expert psychiatric assistance under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (10) trial counsel were *103 ineffective during the penalty phase of his trial for numerous reasons, including the failure of trial counsel to adequately investigate and prepare for the penalty phase and not introducing adequate mitigation evidence; (11) he could not receive the death penalty because he was innocent of first-degree murder; (12) trial counsel were ineffective and the trial judge erred in permitting the jury to consider nonstat-utory aggravating factors; (13) his death sentence is unconstitutional because the jury instructions shifted the burden of proof to the defendant; (14) Florida’s lethal injection constitutes cruel and unusual punishment, violates his equal protection rights, and violates the Florida Constitution’s separation of powers clause; and (15) he cannot be executed due to his insanity.
In May 2010, Diaz filed a motion asserting that he is ineligible to be executed due to his mental retardation under rule 3.203 of the Florida Rules of Criminal Procedure.
The postconviction court held an eviden-tiary hearing on Diaz’s motions on June 21-24, 2010, and September 20-24, 2010. The evidentiary hearing testimony will be discussed in greater detail as it is relevant to addressing Diaz’s numerous claims on appeal. During the evidentiary hearing, the court heard testimony regarding blood and DNA evidence collected at the crime scene from Robert Walker (a crime scene specialist with the Leon County Sheriffs Office), Richard Joslin, Jr. (a commander of forensics with the Lee County Sheriffs Office), Darren Esposito (a crime lab analyst for the Florida Department of Law Enforcement (FDLE)), and Dr. Gary Lit-man (director of the molecular genetics research laboratory at All Children’s Hospital and professor in the molecular medicine program at the University of South Florida). Additionally, the court heard testimony from Kenneth Garber (an assistant public defender who was Diaz’s initial defense attorney), J. Frank Porter (Diaz’s lead trial counsel), Neil Potter (Diaz’s trial counsel), Jesus Casas (the prosecutor during Diaz’s trial), and Maria Gonzalez (the lead prosecutor during Diaz’s trial). On the topic of Diaz’s background, the post-conviction court heard testimony from Donald Hutta (a retired Department of Corrections employee who conducted Diaz’s presentence investigation), Brant Gederian (a former police officer and currently an investigator with the State Attorney’s Office in Fort Myers), Lucy Ortiz (a social worker in Immokalee, Florida), Anna Garcia (a bilingual field researcher in anthropology whose research focuses on farm workers), Dr. David Griffith (an anthropology professor at East Carolina University whose research focuses on low-wage labor and farm labor), Minerva Diaz (Diaz’s sister), Melissa Plourde (formerly Melissa McKemy, Diaz’s friend), and Luz Diaz (Diaz’s aunt). The court also heard testimony from the mental health experts that evaluated Diaz before his trial: Dr. Paul Kling (a clinical psychologist who was hired to examine Diaz prior to trial for competence and sanity and testified on behalf of Diaz at trial), Dr. Bruce Crowell (a forensic psychologist who evaluated Diaz prior to trial pursuant to a court order), and Dr. Richard Keown (a psychiatrist who evaluated Diaz prior to trial and testified on behalf of the State at trial).
With regard to Diaz’s mental retardation motion, the postconviction court heard testimony from Dr. Antonio Puente (a neu-ropsychologist who testified on behalf of Diaz), Dr. Philip Harvey (a clinical psychologist who testified on behalf of Diaz), Dr. Richard Dudley (a psychiatrist with a clinical and forensic practice who testified on behalf of Diaz), and Dr. Michael Ga-mache (a forensic psychologist and neurop-sychologist who testified on behalf of the *104 State). The State also presented testimony regarding Diaz’s adaptive functioning from Lissa Shaw and several current or former mental health specialists who observed Diaz in prison: John Jones, Nicole Parra, Lisa Wiley, and Jennifer Sagle.
Following Dr. Gamache’s testimony, Diaz sought to call Dr. Marc Tassé and Dr. Thomas Oakland as rebuttal witnesses at an unspecified future date. The postcon-viction court denied this request because neither witness had been subpoenaed and Diaz’s attorneys should have anticipated the need for the rebuttal witnesses prior to the September 2010 portion of the eviden-tiary hearing, which was a continuation of the June 2010 evidentiary hearing. The court did, however, permit Diaz to file documents from rebuttal experts by the end of the following week.
Both sides subsequently submitted written closing arguments to the postconviction court on December 22, 2010. On April 6, 2011, the court issued two orders denying all of Diaz’s claims in both his postconviction motion and his mental retardation motion.
On appeal of the postconviction court’s orders denying his motions, Diaz first raises four claims, alleging that he did not have a fair and impartial jury during his trial due to juror misconduct and the State’s failure to disclose material information. Diaz then raises seventeen claims, alleging that trial counsel provided ineffective assistance during both the guilt and penalty phases of his trial. Finally, Diaz argues that the postconviction court erred in not finding him mentally retarded and deprived him of a full and fair hearing on his mental retardation claim. Additionally, in his petition for a writ of habeas corpus, Diaz raises three claims: (1) his sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (2) his death sentence is disproportionate, and this Court failed to undertake a meaningful proportionality review on direct appeal; and (3) this Court conducted an improper harmless error analysis on direct appeal. For the reasons set forth below, we affirm the postconviction court’s denial of Diaz’s motions and deny Diaz’s habeas petition.
III. JURY RELATED CLAIMS
On appeal Diaz argues that the postconviction court erred in denying four jury related claims: (A) the court erred in denying his motion to interview jurors; (B) the court erred in summarily denying his claim of juror misconduct based on foreperson Williams’ failure to disclose information that was relevant and material to her jury service; (C) he was deprived of a trial by an impartial jury due to Williams’ failure to disclose; and (D) the State committed a Brady violation because the State Attorney’s Office had constructive knowledge of Williams’ previous arrest and failed to disclose that information to Diaz.
Specifically, Diaz asserts that during voir dire, juror Williams intentionally failed to disclose that she had been arrested on domestic violence charges, had a restraining order issued against her as a result of the incident that led to her arrest, and had a bias toward victims of domestic violence because of her work as a professor and domestic violence counselor. He further claims that the State Attorney’s Office was aware of Williams’ failure to disclose information regarding her arrest and restraining order because she was enrolled in its pretrial diversion program.
Based on testimony during the eviden-tiary hearing, the postconviction court concluded that the prosecution had no knowledge of Williams’ arrest and restraining order because neither side received the jury list until the morning of jury selection *105 as the jury was being brought into the courtroom. The court further concluded that “[e]ven if the State is imputed with this knowledge, these issues were not material to Ms. Williams service on the jury for a murder trial, the information Ms. Williams’ gave was not false, the information was not favorable to the Defendant, and there is no prejudice since this information does not undermine confidence in the outcome of the trial.” State v. Diaz, No. 97-CF-3305 (Fla. 20th Cir. Ct. post-conviction order filed Apr. 6, 2011) (“Post-conviction Order”) at 8.
The postconviction court did not err in denying Diaz’s motion to interview jurors, summarily denying his juror misconduct claim, and denying his claim that he was deprived of a trial by an impartial jury due to Williams’ failure to disclose. After the verdict was rendered, Diaz could have filed a motion to interview Williams under Florida Rule of Criminal Procedure 3.575. Thus, Diaz could have raised his claims relating to Williams’ failure to disclose on direct appeal. Accordingly, each of these claims is now procedurally barred. See Troy v. State, 57 So.3d 828, 838 (Fla.2011) (concluding substantive juror misconduct claims were procedurally barred because they “could have and should have been raised on direct appeal”); Vining v. State, 827 So.2d 201, 216 (Fla.2002) (concluding motion to interview jurors claim was procedurally barred because it was not raised on direct appeal).
We also affirm the postconviction court’s denial of Diaz’s Brady claim. In order to establish a Brady violation Diaz must demonstrate: “(1) that the evidence at issue is favorable to him, either because it is exculpatory or because it is impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the suppression resulted in prejudice.” Johnson v. State, 921 So.2d 490, 507 (Fla.2005) (citing Rogers v. State, 782 So.2d 373, 378 (Fla.2001)). ‘When reviewing Brady claims, this Court applies a mixed standard of review, ‘deferring] to the factual findings made by the trial court to the extent they are supported by competent, substantial evidence, but reviewing] de novo the application of those facts to the law.’ ” Id. (quoting Lightbourne v. State, 841 So.2d 431, 437-38 (Fla.2003)).
Even assuming that the State had constructive knowledge of Williams’ arrest and restraining order because she was enrolled in the State Attorney’s Office’s pretrial diversion program, Diaz has failed to demonstrate that the evidence was favorable and that he was prejudiced, as required by Brady. First, Diaz has not shown that evidence related to juror Williams’ prior domestic violence arrest and restraining order is favorable to him. It is neither exculpatory nor impeaching. Second, Diaz has failed to demonstrate that he suffered prejudice. “The test for prejudice or materiality under Brady is whether, had the evidence been disclosed, there is a reasonable probability of a different result, expressed as a probability sufficient to undermine confidence in the outcome of the proceedings.” Guzman v. State, 868 So.2d 498, 508 (Fla.2003). Diaz’s claim that trial counsel would have sought to strike Williams for cause based on her arrest and restraining order is not persuasive. Defense attorney Potter testified at the evidentiary hearing that he would not have challenged juror Williams. He explained that the defense wanted Williams on the jury because she was a college professor. Additionally, Diaz has not explained how Williams’ presence on the jury could have been prejudicial. In light of the overwhelming evidence of Diaz’s guilt in this case, Diaz has not established that Williams’ presence on the jury undermines *106 confidence in the verdict or sentence. It was undisputed that Diaz killed Charles Shaw and shot Lissa Shaw, and the sentencing order stated that any single aggravating factor in this case outweighed all of Diaz’s mitigation. See Sentencing Order at 13. Accordingly, Diaz is not entitled to relief on any of his jury related claims.
IV. GUILT PHASE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS
Diaz argues that the postconviction court erred in denying five of his guilt phase ineffective assistance of counsel claims: (A) trial counsel were ineffective for failing to subpoena an FDLE crime lab analyst and being unable to get the analyst’s report admitted into evidence; (B) trial counsel were ineffective for failing to prepare Dr. Kling prior to testifying; (C) trial counsel were ineffective for failing to object to Dr. Keown’s testimony and report regarding the Anger Styles Quiz; (D) trial counsel were ineffective for allowing Diaz to be examined by Dr. Keown in the presence of law enforcement and outside the presence of counsel; and (E) trial counsel were ineffective for failing to interview Melissa Plourde.
In order to prove an ineffective assistance of counsel claim, Diaz “must show that his attorney’s performance was deficient and that the deficient performance prejudiced his defense.” Johnson v. State, 104 So.3d 1010, 1021 (Fla.2012) (quoting Sochor v. State, 883 So.2d 766, 771 (Fla.2004)). In order to satisfy the deficient performance prong, Diaz must demonstrate “that his counsel’s representation ‘fell below an objective standard of reasonableness’ by committing errors ‘so serious that counsel was not functioning as the “counsel” guaranteed ... by the Sixth Amendment.’” Id. (quoting Sochor, 883 So.2d at 771). In order to satisfy the prejudice prong, “the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.” Simmons v. State, 105 So.3d 475, 487 (Fla.2012) (quoting Ferrell v. State, 29 So.3d 959, 969 (Fla.2010)).
This Court applies a mixed standard of review to ineffective assistance of counsel claims because they present mixed questions of fact and law. In Johnson, the Court explained that it “review[s] de novo the postconviction court’s rulings on the Strickland[ v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),] performance and prejudice prongs, but defer[s] to that court’s findings of fact as long as such findings are supported by competent, substantial evidence in the record.” Johnson, 104 So.3d at 1022. “[T]his Court will not substitute its judgment for that of the [postconviction] court on questions of fact and, likewise, on the credibility of the "witnesses and the weight to be given to the evidence by the [postconviction] court.” Porter v. State, 788 So.2d 917, 923 (Fla.2001) (citing Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999)).
A. Failure to Admit FDLE Crime Lab Analyst Report into Evidence
Diaz first claims that trial counsel were ineffective for failing to subpoena FDLE crime lab analyst Darren Esposito and being unable to get his report admitted into evidence. Diaz further argues that competent counsel would have successfully challenged the State’s baseless objections or at a minimum proffered the contents of the report. He claims that the postconviction court erred in not finding prejudice because confidence in the outcome of his trial was undermined by the jury not having the opportunity to hear the evidence.
*107 The report stated that Diaz’s blood was found throughout the Shaw’s home. At trial, defense attorney Porter attempted to admit agent Esposito’s report while agent Walker was testifying. The prosecution objected based on Porter having not established a proper foundation under Frye v. United States, 293 F. 1013 (D.C.Cir.1923). At the evidentiary hearing, former Assistant State Attorney Gonzalez testified that she did not remember why she made a Frye objection to agent Esposito’s FDLE DNA lab report while agent Walker was testifying, and Porter testified that he did not remember why he did not contest Gonzalez’s Frye objection. Further, defense attorney Potter testified that the DNA evidence “wasn’t going to go anywhere” because it only supported a self-defense claim, and “there [was] no defense of self-defense” in this case. Based on that evidence, the postconviction court concluded that trial counsel were not deficient. Post-conviction Order at 26-26. The court also concluded that Diaz did not suffer prejudice because “[t]he evidence of Defendant’s blood in the home, even if admitted, would not have corroborated his defense, and there is no reasonable probability that admission of this evidence would have changed the outcome.” Id. at 26.
We agree with the postconviction court’s conclusion that Diaz’s trial counsel did not perform ineffectively when they failed to admit the blood evidence, which would not have corroborated a viable defense. The FDLE lab report would have had minimal impact on Diaz’s insanity defense. The report would have merely indicated that Diaz’s blood was found in various places throughout the Shaw home. However, it would not have demonstrated that Diaz’s blood was found throughout the home because of injuries inflicted upon him by Charles Shaw or supported the idea that Diaz was insane. Thus, Diaz is not entitled to relief on this claim.
B. Failure to Prepare Dr. Kling
Second, Diaz claims that trial counsel were ineffective for failing to prepare Dr. Kling prior to testifying. Specifically, Diaz argues that if trial counsel had prepared Dr. Kling, the State would not have been able to discredit Dr. Kling on cross-examination by getting him to acknowledge that Diaz had “ungovernable anger” and that he was unaware of or had forgotten several facts of Diaz’s crime. Diaz further argues that the postconviction court improperly ignored Dr. King’s ac-knowledgement at the evidentiary hearing that he was not provided with several significant pieces of information, including Diaz’s exposure to “high levels of toxic pollution,” which would have led him to recommend a neuropsychological evaluation of Diaz.
The postconviction court concluded that Diaz failed to satisfy either prong of Strickland because Diaz did not specify “how or why more preparation would have changed Dr. King’s truthful testimony” and his allegations of deficiency were refuted by the record and evidentiary hearing testimony of trial counsel and Dr. Kling. Id. at 27. The court also noted that Diaz “failed to allege what additional explanation should have been elicited.” Id.
We agree with the postconviction court’s conclusion that Diaz did not satisfy either prong of Strickland. Dr. King’s admission during the evidentiary hearing that he “could have done a better job” when he testified at trial does not satisfy the deficient performance prong. Dr. King’s testimony at the evidentiary hearing that the additional information presented to him regarding Diaz would not have changed his testimony indicates that trial counsel gave Dr. King sufficient information to evaluate Diaz.
*108 Further, Diaz’s allegation with regard to prejudice on this claim was conclusory. “This Court has held that vague and con-clusory allegations on appeal are insufficient to warrant relief.” Doorbal v. State, 983 So.2d 464, 482 (Fla.2008). Diaz does not explain how a neuropsychological evaluation would have potentially led to a different result in his trial. Further, the record does not contain any definitive evidence that Diaz was exposed to “high levels of toxic pollution.” Instead, Anna Garcia and Dr. David Griffith each stated at the evidentiary hearing that based on the information they had received regarding Diaz’s background and their knowledge of farm labor, they believed that he had been exposed to pesticides and chemicals while working in the fields. Accordingly, Diaz has failed to establish either prong of Strickland on this claim.
C.Failure to Object to Dr. Keown’s Anger Styles Quiz Results
Third, Diaz claims that trial counsel were ineffective for failing to object to Dr. Keown’s testimony and report regarding the Anger Styles Quiz. Diaz argues that the postconviction court erred in concluding that he did not allege the deficiency or prejudice prong of Strickland in his motion. He further argues that the court overlooked the argument he made in his written closing argument, submitted following the evidentiary hearing.
Diaz’s allegations in his motion do not assert on what basis reasonable counsel would have objected to the admission of the evidence or how he was prejudiced as a result, even though he later argued that trial counsel should have objected based on Frye. Even assuming that Diaz presented a facially sufficient claim on this issue, Diaz was not prejudiced by Dr. Keown’s testimony and report regarding the Anger Styles Quiz because the evidence was not inconsistent with the defense’s theory. Diaz’s defense did not dispute that he shot his ex-girlfriend and killed her father. Instead, the defense attempted to demonstrate that Diaz was insane and lacked the premeditation necessary to be guilty of first-degree murder. In fact, the defense presented similar testimony about Diaz’s temper from Dr. Kling. Accordingly, Diaz is not entitled to relief on this claim because he has failed to demonstrate the prejudice prong of Strickland.
D.Failure to Accompany Diaz to Interview with Dr. Keown
Fourth, Diaz claims that trial counsel were ineffective for allowing Diaz to be examined by Dr. Keown in the presence of law enforcement and outside the presence of counsel. The postconviction court concluded that Diaz did not sufficiently allege either prong of Strickland in his motion. Postconviction Order at 21. In his motion Diaz did not assert how his examination with Dr. Keown would have gone differently had counsel been present or how he was prejudiced as a result of counsel’s lack of presence at his examination. Thus, Diaz is not entitled to relief. See Doorbal, 983 So.2d at 483.
E.Failure to Interview Melissa Plourde
Fifth, Diaz claims that trial counsel was ineffective for failing to interview Melissa Plourde, who could have testified about his state of mind during the time leading up to the offense, which would have impacted both the guilt and penalty phases. Specifically, Diaz argues that the postconviction court erroneously conflated the two prongs of Strickland and accepted the prosecutor’s hindsight rationalization of why Plourde’s testimony may have been harmful.
In its order the postconviction court stated that Diaz “did not question Ms. [Plourde] concerning any testimony she *109 may have been able to provide at trial regarding Defendant’s state of mind prior to the offense.” Postconviction Order at 24. It then concluded that: “Any testimony of ... [Plourde] regarding Defendant’s state of mind prior to the offense would thus have been cumulative to that of Jose Diaz and Defendant, and [Plourde’s] testimony regarding the Western Auto incident would have been harmful to Defendant.” Id. at 24-25. Further, the court noted that attorney Porter testified at the evi-dentiary hearing that he did not remember if Diaz told him what Plourde would have testified to and that he would not have called her as a witness if she would have been harmful. Id. at 25.
We agree with the postconviction court’s conclusion that trial counsel did not perform ineffectively by failing to interview a potential witness who would have provided cumulative and harmful testimony. At the evidentiary hearing Plourde testified that Diaz was depressed following his break up with Lissa Shaw and that he had quit his job. She also testified about Diaz assaulting Lissa Shaw in the parking lot of a Western Auto store after their break up. Plourde said that while she was driving with Diaz, he saw Lissa Shaw’s car pull into the parking lot of Western Auto and he asked Plourde to pull in so he could speak to Lissa Shaw. Plourde dropped Diaz off and circled around the parking lot. When she returned she saw Diaz hit Lissa Shaw.
This Court has “held that counsel does not render ineffective assistance by failing to present cumulative evidence.” Farina v. State, 937 So.2d 612, 624 (Fla.2006). Further, counsel is not ineffective for deciding not to call a witness whose testimony will be harmful to the defendant. See Johnston v. State, 63 So.3d 730, 741 (Fla.2011). Here, Plourde’s testimony would have been both cumulative regarding Diaz’s depression and harmful because she would have testified about the domestic abuse.
Furthermore, Diaz would not have obtained a more favorable result as a result of trial counsel having interviewed Plourde. Interviewing her would not have prevented her testimony from being harmful to Diaz. Accordingly, Diaz is not entitled to relief on any of his guilt phase ineffective assistance of counsel claims.
V. PENALTY PHASE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS
Diaz argues that the postconviction court erred in denying eleven of his penalty phase ineffective assistance of counsel claims: (A) trial counsel were ineffective for failing to obtain his school records, birth certificate, color photographs of the crime scene, agent Esposito’s FDLE reports, attorney Garber’s notes regarding his defense strategy and from interviews with Diaz’s family, police reports, orders appointing Lucy Ortiz and Dr. Ricardo Rivas as experts to assist the defense, Dr. Crowell’s report, Diaz’s jail medical records, and social security earnings statements; (B) trial counsel were ineffective for failing to retain mental health experts for the penalty phase; (C) trial counsel were ineffective for failing to retain an expert in migrant farm labor; (D) trial counsel were ineffective for failing to retain a mitigation specialist; (E) trial counsel were ineffective for failing to discover and present evidence of sexual abuse within Diaz’s family; (F) trial counsel were ineffective for not having a cohesive theme for both the guilt phase and the penalty phase; (G) trial counsel were ineffective for failing to prepare Minerva Diaz for her penalty phase testimony; (H) trial counsel were ineffective for failing to move to disqualify the trial judge; (I) trial counsel *110 were ineffective for failing to prepare Diaz to testify and offer an apology during the penalty phase; (J) trial attorney Potter was ineffective for misstating the standard of proof regarding the mitigating factors during closing argument; and (K) Potter was ineffective for conceding during closing argument that the murder involved planning and that there was a “heightened level of premeditation” with respect to Lis-sa Shaw. Additionally, Diaz claims that the cumulative effect of these errors entitles him to a new trial or at least a new penalty phase.
During the penalty phase, the State presented no new evidence. It relied entirely on the evidence presented during the guilt phase to argue in favor of the three aggravating factors — HAC, CCP, and prior violent felony conviction.
Diaz presented two witnesses, Minerva Diaz and himself. Minerva Diaz, Diaz’s sister, testified about the impoverished, abusive upbringing that Diaz and his siblings endured. She also testified that because their father had decided to stop working, Diaz dropped out of school in the ninth grade so that he could work to help support his family. Diaz testified that he had no convictions other than traffic offenses prior to this crime and apologized for the pain he caused to his family and the Shaw family.
In closing arguments, Potter asked the jury to rely on the guilt phase testimony of Dr. Kling to find the mitigating factors that Diaz was under the influence of extreme mental or emotional disturbance and his capacity to appreciate the criminality of his conduct was substantially impaired. In arguing against the proposed aggravating factors, Potter asked the jury to rely on the medical examiner’s guilt phase testimony that Charles Shaw would have died quickly from being shot in the chest. Potter argued that the prior violent felony aggravating factor should carry less weight because the prior violent felonies occurred during the same incident as the murder of Charles Shaw. In response to the CCP aggravating factor, Potter argued that it did not exist in this case because Diaz lacked the requisite level of premeditation toward Charles Shaw even though he had some level of premeditation regarding Lissa Shaw.
“In reviewing a claim that counsel’s representation was ineffective based on a failure to investigate or present mitigating evidence, the Court requires the defendant to demonstrate that the deficient performance deprived the defendant of a reliable penalty phase proceeding.” Hoskins v. State, 75 So.3d 250, 254 (Fla.2011). “As the Supreme Court noted in Strickland, ‘the reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions.’ ” Cherry v. State, 781 So.2d 1040, 1050 (Fla.2000) (quoting Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Even when the defendant is uncooperative, trial counsel must “conduct some sort of mitigation investigation.” Porter v. McCollum, 558 U.S. 30, 40, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009). Trial counsel cannot make a reasonable strategic decision when counsel does not “conduct a thorough investigation of the defendant’s background.” Sears v. Upton, 561 U.S. 945, 130 S.Ct. 3259, 3265, 177 L.Ed.2d 1025 (2010). “However, ‘Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.’ ” Taylor v. State, 3 So.3d 986, 998 (Fla.2009) (quoting Wiggins v. Smith, 539 U.S. 510, 533, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)).
*111 To satisfy the prejudice prong of Strickland, Diaz “must show that but for his counsel’s deficiency, there is a reasonable probability he would have received a different sentence.” Porter, 558 U.S. at 41, 130 S.Ct. 447. This does “not require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Id. at 44, 130 S.Ct. 447 (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052).
A. Failure to Obtain Records
In his first penalty phase ineffective assistance of counsel claim, Diaz claims that trial counsel were ineffective for failing to obtain his school records, birth certificate, jail medical records, social security records, color photographs of the crime scene, FDLE crime lab reports, his former attorney’s handwritten notes, police reports, orders appointing Lucy Ortiz and Dr. Ricardo Rivas as experts, and Dr. Crowell’s report. Diaz argues that trial counsel were ineffective for failing to obtain these documents because attorneys cannot make strategic decisions blindly and in a manner that is inconsistent with the American Bar Association (ABA) Guidelines. He asserts that trial counsel’s deficiency is even more glaring because most of these documents were contained in the file compiled by Diaz’s initial attorney, Kenneth Garber, who offered trial counsel access to his file. For the prejudice prong of Strickland, Diaz claims that it is possible that if additional mitigating evidence had been presented, more jurors would have voted for a life sentence because three jurors did so despite the minimal mitigation evidence that trial counsel presented.
The postconviction court summed up its analysis of this claim by stating:
What mitigation evidence existed was presented, and was considered by the jury and the trial court. That current defense counsel can now provide reams of school, medical, and other documents of ambiguous value, to corroborate the evidence already presented, or the testimony of experts who disagree with the findings of previous experts, does not render trial counsel’s performance at the time, based on the information they had, ineffective. See Cherry v. State, 781 So.2d 1040, 1052 (Fla.2000). Further, Defendant has failed to establish prejudice, in that he has failed to show that any additional mitigation evidence would have outweighed the aggravating factors. Nor has Defendant shown that he was deprived of a reliable penalty phase proceeding.
Postconviction Order at 36-37. Further, the court found credible trial counsel Potter’s testimony that he would have obtained school records, medical records, and other documents if he thought the documents would have been helpful. Id. at 36. The court concluded that Potter’s decision not to perform “kitchen sink” mitigation— because it was usually ineffective with juries and judges prefer selective mitigation — was reasonable trial strategy. Id.
We do not need to address the deficient performance prong of Strickland because even if Diaz’s trial counsel were deficient for failing to obtain these documents, Diaz cannot satisfy the prejudice prong of Strickland. Diaz does not identify any specific facts contained in the documents that should have been brought to the attention of the judge or jury but were not. The jury — which voted nine to three in favor of a death sentence — would not have heard any evidence that was not cumulative. A defendant is not prejudiced by trial counsel’s failure to present cumu *112 lative evidence. See Farina, 937 So.2d at 624.
Nor would the cumulative evidence influence the sentencing judge. In its sentencing order the trial court concluded that: “The aggravating circumstances in this case far outweigh the mitigating circumstances. Each one of the aggravating circumstances in this case, standing alone, would be sufficient to outweigh the mitigation that can be found in the Defendant’s 28 years of existence on this earth.” Sentencing Order at 13.
Based on the sentencing order, the chance that documents that the postconviction court described as having “ambiguous value” could tilt the weight of mitigating factors in favor of a life sentence is remote. The failure to obtain records here thus does not undermine confidence in the outcome of the penalty phase. At best, the documents simply corroborate the existing mitigation evidence without materially affecting the balance of mitigation and aggravation. Therefore, Diaz is not entitled to relief on this claim.
B. Failure to Retain Penalty Phase Mental Health Experts
Diaz claims that trial counsel were ineffective for failing to hire mental health experts for the penalty phase. Specifically, Diaz argues that the postconviction court erroneously credited trial counsel’s testimony that they did not hire penalty phase mental health experts because neither their interaction with Diaz nor the reports from the pretrial mental health experts who evaluated Diaz indicated that he had mental health issues. Diaz further argues that even though trial counsel claimed they relied on Dr. Kling’s guilt phase testimony during the penalty phase, Potter failed to connect the testimony to the mental health mitigating factors in his penalty phase arguments, and Dr. Kling’s credibility was already destroyed by the State’s cross-examination of him. Additionally, Diaz argues that a penalty phase mental health expert would have presented evidence of his low IQ and cognitive deficits. Consequently, Diaz claims that his penalty phase proceedings were unreliable because more jurors would have voted in favor of a life sentence had they been presented with the additional mitigation evidence.
The postconviction court concluded that trial counsel “conducted reasonable investigation into mental health mitigation evidence, and made a reasonable tactical decision not to pursue the investigation further upon receiving no useful information from Defendant, his family, or the experts’ evaluations.” Postconviction Order at 35. The court’s conclusion that Diaz’s trial counsel did not perform deficiently in failing to obtain penalty phase mental health experts because the evaluations they received from the mental health experts that examined Diaz before trial did not indicate that further evaluation was necessary is supported by competent, substantial evidence.
Prior to trial, Diaz was evaluated by three mental health experts: Dr. Kling, Dr. Keown, and Dr. Crowell. Trial counsel testified that they did not seek out additional mental health experts because nothing in the reports they received from the pretrial experts or their interactions with Diaz justified obtaining additional mental health experts. None of the mental health reports that trial counsel received indicated that Diaz was mentally retarded or had brain damage. Further, Potter testified that Diaz actively resisted trial counsel’s inquiries regarding his mental health.
Dr. Kling’s initial report for defense counsel concluded that Diaz was sane at the time of the crime; however, upon reconsideration he concluded that Diaz was *113 insane and prepared a second report. During the guilt phase of the trial, Dr. Kling testified that Diaz was insane at the time of the crime and acknowledged that Diaz had anger issues.
In its sentencing order, the trial court relied on Dr. Kling’s guilt phase testimony to find that one of the two statutory mental health mitigating factors had been established — the capital felony was committed while Diaz was under the influence of extreme mental or emotional disturbance, given moderate weight. Sentencing Order at 9-10. The trial court went on to conclude that Diaz failed to prove the other statutory mental health mitigating factor that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. As a result, the trial court afforded it very little weight. Id. at 10.
This Court has held that trial counsel is not per se ineffective when they do not call mental health experts in the penalty phase, but instead rely on their experts’ guilt phase testimony. See Carroll v. State, 815 So.2d 601, 616 (Fla.2002) (citing Provenzano v. Dugger, 561 So.2d 541, 546 (Fla.1990)). Thus, to show deficiency, Diaz must demonstrate that counsel’s presentation of mental health testimony was somehow lacking, not merely that it was presented during the guilt phase rather than the penalty phase.
Further, this Court has concluded that trial counsel is not ineffective for relying on evaluations conducted by qualified mental health experts. See Stewart v. State, 37 So.3d 243, 251 (Fla.2010). Trial counsel is not deficient because the defendant is able to find postconviction mental health experts that reach different and more favorable conclusions than the mental health experts consulted by trial counsel. Asay v. State, 769 So.2d 974, 986 (Fla.2000). Diaz has not demonstrated that the mental health experts retained for trial were not qualified experts. Thus, counsel acted reasonably in relying on the experts.
Even if trial counsel’s performance was deficient, Diaz cannot satisfy the prejudice prong of Strickland. Diaz merely speculates that the additional information that the judge and jury would have heard had trial counsel hired a penalty phase mental health expert would have tilted the weight of the evidence in favor of a life sentence. The additional evidence of Diaz’s low intelligence presented by experts retained for Diaz’s mental retardation claim would have revealed that his deficits may be the result of his possible exposure to toxins as a child while working in the fields. But no expert testified that Diaz’s intelligence was so low that he could not appreciate the criminality of his conduct. The trial court found one statutory mental health mitigating factor in its sentencing order, giving moderate weight to Diaz being under the influence of extreme mental or emotional disturbance, which indicates that it gave some weight to Dr. Kling’s guilt phase testimony when sentencing Diaz. Because the sentencing order was clear that the aggravating factors substantially outweighed the mitigating factors, confidence in the outcome of Diaz’s penalty phase would not be undermined even if the trial court gave significantly greater weight to the statutory mental health mitigating factor of Diaz committing the capital felony while under extreme mental or emotional disturbance, concluded that Diaz established the mitigating factor that he lacked the capacity to appreciate the criminality of his conduct, or found additional nonstatutory mental health mitigation. Thus, confidence in the outcome is not undermined, and Diaz is not entitled to relief on this claim.
*114 C.Failure to Hire an Expert in Migrant Farm Labor
Diaz argues that trial counsel were ineffective for failing to retain an expert in migrant farm labor. Diaz asserts that trial counsel could have learned about the harshness of migrant farm labor and gained a better understanding of Diaz’s background and his potential for being exposed to pesticides and violence in the fields. Diaz’s argument fails to allege the prejudice prong in more than a conclu-sory manner. Thus, Diaz is not entitled to relief. See Doorbal, 983 So.2d at 482.
D.Failure to Hire a Mitigation Expert
Diaz claims that trial counsel were ineffective for failing to hire a mitigation specialist. The postconviction court concluded that Diaz did not satisfy either prong of Strickland on this claim. Diaz makes conclusory assertions that trial counsel were ineffective for not hiring a mitigation expert because trial counsel could have learned more about Diaz’s background and effectively communicated with his mother. Diaz’s argument fails to allege either prong of Strickland in more than a conclusory manner. Diaz does not identify any specific facts that would have been uncovered by a mitigation specialist. Thus, Diaz is not entitled to relief. See Hoskins, 75 So.3d at 256 (rejecting defendant’s conclusory claim that trial counsel was ineffective for failing to hire a mitigation specialist); Doorbal, 983 So.2d at 482.
E.Failure to Discover and Present Evidence of Sexual Abuse within Diaz’s Family
Diaz claims that trial counsel was ineffective for failing to discover and present evidence of sexual abuse within Diaz’s family. Diaz’s argument fails to allege either prong in more than a conclusory manner. Thus, Diaz is not entitled to relief. See Doorbal, 983 So.2d at 482. Moreover, this claim fails on the merits. This Court has previously concluded that trial counsel was not ineffective for failing to discover that the defendant was sexually abused when the defendant and his family were not forthcoming with the information, even though trial counsel was aware of the defendant’s rough childhood. Asay, 769 So.2d at 987-88. Here, similarly, Porter and Potter testified at the evidentiary hearing that Diaz and his sister, Minerva Diaz, were not forthcoming with information regarding abuse when speaking with trial counsel in preparation for the penalty phase. Trial counsel were not deficient for failing to obtain information regarding sexual abuse that Diaz and his family did not disclose. See id.
F.Failure to Have a Cohesive Theme
Diaz claims that trial counsel were ineffective for not having a cohesive theme for both the guilt phase and the penalty phase. Specifically, Diaz argues that Potter conceded at the evidentiary hearing that he had no defense theory, and such a concession is contrary to guideline 10.11 of the 2003 ABA Guidelines, which provides that defense counsel should develop a consistent theme to present through both phases of the trial.
The postconviction court concluded that Diaz did not satisfy either prong of Strickland on this claim. Diaz’s claim is refuted by the record. Diaz misstates Potter’s testimony during the evidentiary hearing. Potter was asked, “what was the theory of defense in the guilt phase?” Potter responded: “I’m really kind of at a loss, because there really wasn’t a whole heck of a lot of defense in this case. This case went to trial because Mr. Diaz wouldn’t listen to his attorneys.” Further, the trial record reveals that Porter’s theory during *115 the guilt phase was a combination of insanity and self-defense, primarily focusing on insanity, and Potter’s penalty phase opening and closing arguments indicate that he also focused on insanity. Moreover, even if trial counsel lacked a cogent theme, Diaz does not state how he was prejudiced by it. Thus, Diaz is not entitled to relief. See Doorbal, 983 So.2d at 482.
G.Failure to Prepare Minerva Diaz to Testify
Diaz claims that trial counsel were ineffective for failing to prepare Minerva Diaz for her penalty phase testimony. The postconviction court concluded that Diaz did not satisfy either prong of Strickland on this claim. Diaz’s argument fails to allege either prong in more than a conclusory manner, Diaz does not specify in his motion or brief what additional information Minerva Diaz would have been able to testify about at trial had she been better prepared, and during the evidentiary hearing, Minerva Diaz was not asked what specific information she would have been able to testify to had she been better prepared to testify. Thus, Diaz is not entitled to relief. See id.
H.Failure to Disqualify Trial Judge
Diaz claims that trial counsel were ineffective for failing to move to disqualify the trial judge because Minerva Diaz had pending criminal charges before the judge. Diaz alleges that this failure constituted ineffective assistance of counsel because the trial judge would not find Minerva Diaz to be a credible witness as a result of the trial court’s personal knowledge of the facts surrounding Minerva’s criminal case.
“A motion to disqualify will be dismissed as legally insufficient if it fails to establish a well-grounded fear on the part of the movant that he will not receive a fair hearing.” Griffin v. State, 866 So.2d 1, 11 (Fla.2003) (concluding no deficiency where counsel failed to move to disqualify trial judge based on judge’s comment during a prior sentencing proceeding indicating that he thought defendant would continue committing crimes and trial judge’s ex parte explanation to victim’s father regarding a delay in the trial). A motion to disqualify is legally sufficient when “the facts alleged would place a reasonably prudent person in fear of not receiving a fair and impartial trial.” Id. “A mere ‘subjective fear[ ]’ of bias will not be legally sufficient; rather, the fear must be objectively reasonable.” Lynch v. State, 2 So.3d 47, 78 (Fla.2008) (quoting Arbelaez v. State, 898 So.2d 25, 41 (Fla.2005)).
A defendant does not satisfy either prong of Strickland when claiming that trial counsel was ineffective for failing to file a motion to disqualify if counsel would not have prevailed on the motion. Grim v. State, 971 So.2d 85, 96-97 (Fla.2007). “[A]bsent some showing of bias, a motion to disqualify that is based on a judge’s prior involvement in a witness’s ease is insufficient to support a motion to [disqualify].” Johnson v. State, 769 So.2d 990, 996 (Fla.2000). Diaz merely alleges that the trial judge would not view Minerva Diaz as a credible witness because he was presiding over her criminal case at the time of Diaz’s trial. Diaz has not demonstrated any specific bias held by the trial judge toward him or Minerva Diaz. Because Diaz has failed to allege grounds that would have enabled trial counsel to file a legally sufficient motion to disqualify, he has failed to satisfy either prong of Strickland. Thus, Diaz is not entitled to relief.
I.Failure to Prepare Diaz to Testify and Show Remorse
Diaz claims that trial counsel were ineffective for failing to prepare him to *116 testify and offer an apology during the penalty phase. Specifically, Diaz argues that trial counsel’s failure to prepare him to testify led Diaz to admit during cross-examination that Lissa Shaw had “take[n] his beatings” in the past. Diaz further argues that by failing to prepare him to show appropriate remorse when apologizing, the State was able to argue that Diaz never showed any remorse for his crimes, even though lack of remorse cannot be considered as an aggravating factor under Robinson v. State, 520 So.2d 1, 6 (Fla.1988).
The postconviction court concluded that this claim
is refuted by the record. Mr. Porter testified at the evidentiary hearing that he did prepare Defendant regarding his trial testimony, and that Defendant understood the questions and appropriate answers. Presuming Defendant testified truthfully at trial, he has failed to specify how or why additional preparation would have altered that truthful testimony.
Postconviction Order at 26-27.
Diaz truthfully acknowledged on cross-examination that he had beaten Lissa Shaw. Diaz has failed to explain how additional preparation by trial counsel would have prevented him from maldng this truthful concession in response to the State’s question.
This Court has held that while remorse may be considered as a mitigating factor, lack of remorse cannot be used as an aggravating factor. Robinson, 520 So.2d at 6. The State can argue against the nonstatutory mitigating factor of the defendant’s remorse. See Walton v. State, 547 So.2d 622, 625 (Fla.1989). The State argued in its closing argument that Diaz was not genuinely remorseful, and thus the jury should not give any weight to his remorse as a mitigating factor. The State did not argue that Diaz’s lack of remorse should serve as an aggravating factor.
Further, the sentencing order indicates that Diaz’s apology and remorse were considered by the trial judge as a nonstatuto-ry mitigating factor. The sentencing order gave “very little weight” to it because “[wjhile one might characterize the words spoken as an expression of remorse, the attitude of the Defendant belies a finding by the Court that true remorse has been expressed.” Sentencing Order at 11. Therefore, Diaz’s apology was appropriately considered as a potential mitigating factor. See Robinson, 520 So.2d at 6. The trial court gave very little weight to Diaz’s expression of remorse because of his attitude, not because the words he used were inadequate. Because Diaz has not explained how trial counsel could have made him a more credible witness, he has not demonstrated that trial counsel were deficient.
Further, even if trial counsel were somehow deficient, confidence in the outcome is not undermined as a result of Diaz being less credible as a witness than he could have been. The sentencing order is clear that each aggravating factor standing alone would have outweighed all of the mitigating factors combined. Thus, Diaz is not entitled to relief on this claim.
J. Misstatement of Standard of Proof for Mitigators
Diaz claims that defense attorney Potter was ineffective for misstating the standard of proof regarding mitigating factors during closing argument. Diaz asserts that trial counsel erroneously stated that the standard of proof for mitigating factors is a “preponderance of the evidence” instead of “reasonably convinced.” At the time of Diaz’s trial in 2000, the standard jury instructions did contain the “reasonably convinced” standard. See *117 Standard Jury Instructions in Criminal Cases-No. 96-1, 690 So.2d 1263, 1268 (Fla.1997) (“If you are reasonably convinced that a mitigating circumstance exists, you may consider it as. established.”). But the standard instruction was not consistent with the established law, which recognized that mitigating factors be “established by the greater weight of the evidence.” Mansfield v. State, 758 So.2d 636, 646 (Fla.2000) (quoting Campbell v. State, 571 So.2d 415, 419 (Fla.1990)). In 2009, we corrected the erroneous instruction, explaining that “[although the current and proposed instructions provide that the jury need only be ‘reasonably convinced’ that a mitigating circumstance exists, our case law has stated this burden in terms of the greater weight of the evidence or in terms of a preponderance of the evidence, which are in fact synonymous.” In re Standard Jury Instructions in Criminal Cases-Report No. 2005-2, 22 So.3d 17, 21 (Fla.2009) (citations omitted). Thus, Diaz is not entitled to relief.
K. Conceding Planning and Premeditation
In his final ineffective assistance of counsel claim, Diaz claims that Potter was ineffective for conceding during closing argument that the murder involved planning and that there was a “heightened level of premeditation” with respect to Lis-sa Shaw. In denying this claim, the post-conviction court noted that the penalty phase transcript refutes this claim because it shows that Potter did not concede CCP regarding victim Charles Shaw. Postcon-viction Order at 38. We conclude that Diaz is not entitled to relief because Potter made a reasonable strategic decision to concede heightened premeditation regarding Lissa Shaw in order to maintain credibility with the jury.
Counsel does not provide ineffective assistance by conceding facts that are supported by overwhelming evidence. See Patton v. State, 784 So.2d 380, 390 (Fla.2000). This Court has concluded that “concessions of guilt of a lesser crime during the guilt phase and argument relative to [the defendant’s] guilt during the penalty phase were reasonable and informed tactical decisions.” Lawrence v. State, 831 So.2d 121, 131 (Fla.2002).
The applicability of the theory of transferred intent was a disputed issue during the penalty phase and again on direct appeal to this Court. Potter argued that transferred intent was not applicable during the bench conference that followed his objection to the State’s argument in favor of its applicability. While arguing against the appropriateness of the CCP aggravating factor during penalty phase closing argument, Potter argued: “The defense would submit to you that, yes, there was some planning involved in this.... The defense’s position is the person that Mr. Diaz was thinking about in the days and weeks prior to this event was Lissa Shaw.” Later in his closing argument Potter stated: “The defense’s position is that when [Diaz] went over there, he really wasn’t going over there to confront or mess with Mr. Shaw. He went over there to deal with Lissa.” Finally, Potter argued: “The important thing is in order for this aggravating circumstance to apply, a heightened level of premeditation demonstrated by a substantial period of reflection is required. The defense would argue for Lissa, yes; for Mr. Shaw, no.” On direct appeal, this Court split four to three on the issue of whether transferred intent was applicable in Diaz’s case. See Diaz v. State, 860 So.2d at 972.
Potter’s argument was consistent with the defense’s theory during the guilt phase that Diaz lacked the mental state required *118 to commit the first-degree murder of Charles Shaw because Diaz was insane and the murder occurred following a confrontation involving Diaz and the victim. As a result, Potter made a reasonable strategic decision by conceding that Diaz had demonstrated premeditation toward Lissa Shaw, while arguing that he lacked premeditation toward Charles Shaw, even though he took a calculated risk of receiving an adverse ruling on the applicability of transferred intent. See Patton, 784 So.2d at 390; Lawrence, 831 So.2d at 131. Thus, Potter’s performance was not deficient. Accordingly, Diaz is not entitled to relief on any of his penalty phase ineffective assistance of counsel claims.
L. Cumulative Error
Diaz claims that the cumulative effect of his trial attorneys’ deficiencies during trial undermines confidence in the outcome of his trial or, at a minimum, his penalty phase. “Where several errors are identified, the Court ‘considers the cumulative effect of evidentiary errors and ineffective assistance [of counsel] claims together.’” Hurst v. State, 18 So.3d 975, 1015 (Fla.2009) (quoting Suggs v. State, 923 So.2d 419, 441 (Fla.2005)). Conversely, a cumulative error claim fails when there are not multiple errors. Johnson, 104 So.3d at 1029. Diaz has failed to demonstrate multiple errors. Therefore, Diaz’s cumulative error claim must fail. See id.
VI. MENTAL RETARDATION CLAIMS
On appeal Diaz raises two claims regarding the denial of his mental retardation motion. First, he alleges that the postconviction court deprived him of a full and fair hearing on his mental retardation claim. Second, Diaz claims that the court erred by concluding that he is not mentally retarded.
A. Full and Fair Hearing
Diaz claims that he was deprived of a full and fair hearing on his mental retardation motion because the postconviction court abused its discretion in denying his motion for a continuance so that he could call rebuttal expert witnesses. Diaz argues that had he been granted a continuance, he would have called three expert witnesses to rebut the testimony of the State’s expert, Dr. Gamache, who the court should not have recognized as an expert.
Diaz was not denied a full and fair evi-dentiary hearing on his mental retardation claim. This Court has stated that:
Granting a continuance is within the trial court’s discretion, and the court’s ruling on a motion for continuance will be reversed only when an abuse of discretion is shown. An abuse of discretion is generally not found unless the court’s ruling on a continuance results in undue prejudice to the defendant.
Randolph v. State, 853 So.2d 1051, 1062 (Fla.2003) (footnote and citations omitted). Here, the postconviction court did not abuse its discretion.
Diaz sought a continuance at the end of the evidentiary hearing in order to call rebuttal witnesses in response to Dr. Gamache’s testimony. The first part of the evidentiary hearing occurred in June 2010, and the second part occurred in September 2010. Diaz’s postconviction counsel deposed Dr. Gamache prior to the September portion of the evidentiary hearing. Therefore, defense counsel was aware of the substance of Dr. Gamache’s testimony before the September portion of the evi-dentiary hearing and should have been prepared to present rebuttal at that time.
Moreover, the postconviction court permitted Diaz to submit written documents from his proposed witnesses to rebut Dr. Gamache’s testimony. Thus, even if the *119 court erred, Diaz was not prejudiced by the court’s denial of his request for a continuance.
B. Mental Retardation
Diaz claims that the postconviction court erred in concluding that he is not mentally retarded and consequently denying his motion asserting that he is ineligible to be executed due to his mental retardation. Diaz argues that the court erred in rejecting the testimony of his experts, Dr. Harvey and Dr. Puente, as well as Diaz’s score of 57 on the Wechsler Adult Intelligence Scale — Fourth Edition (WAIS-IV) administered by Dr. Harvey, and then accepting the testimony of the State’s expert, Dr. Gamache. Diaz further argues that the State did not present any evidence to counter his contention that he has significantly subaverage intellectual functioning.
At the evidentiary hearing, Dr. Harvey testified on behalf of Diaz that he administered the WAIS-IV to Diaz in 2010 and that Diaz scored a 57 on it. Dr. Harvey further testified that Diaz’s scores on the various components of the WAIS-IV and the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) place his intellectual functioning in the bottom one percent of the population.
Dr. Puente testified on behalf of Diaz regarding Diaz’s deficits in adaptive functioning. Dr. Puente concluded that Diaz suffers from deficits in all of the aspects of adaptive functioning. Dr. Puente partially based his conclusions on the Adaptive Behavior Assessment System — Second Edition (ABAS-II) tests that he administered to Diaz’s siblings, Minerva Diaz and Jose Diaz, Jr. The ABAS-II involved asking both Minerva and Jose approximately 250 questions regarding Diaz’s ability to perform various basic tasks. Dr. Puente acknowledged that he did not score the first eleven responses on the ABAS-II administered to Minerva and that the score sheet reflected that neither Minerva nor Jose indicated that any of their responses were guesses, which is unusual. Dr. Puente further testified that the low quality cars and fake jewelry that Diaz purchased indicate that he is mentally retarded.
Dr. Dudley testified on behalf of Diaz regarding the onset of Diaz’s cognitive deficits prior to the age of eighteen. Dr. Dudley concluded that based on the information he received about Diaz’s work in farm labor as a child, the exposure to toxins that he likely endured in the fields was the likely cause of Diaz’s cognitive deficits.
Dr. Gamache testified on behalf of the State and rebutted the testimony of Dr. Harvey and Dr. Puente. Dr. Gamache concluded that Diaz does not have subav-erage intellectual functioning and does not suffer from any deficits in adaptive functioning. He concluded that Diaz’s standardized test scores on the California Achievement Test indicated that he is not retarded. Dr. Gamache noted that one year, Diaz scored in the eighty-second percentile nationally. Therefore, Diaz’s poor performance in school was attributable to other factors, such as sporadic attendance, lack of motivation, or malnutrition.
In response to Dr. Harvey’s testimony, Dr. Gamache questioned the validity of Dr. Harvey’s scoring on the WAIS-IV administered to Diaz in 2010 and the Wechsler Abbreviated Scale of Intelligence (WASI) administered in 2005. Regarding the WAIS-IV, Dr. Gamache testified that Dr. Harvey did not properly follow the administrative guidelines, improperly scored at least five of Diaz’s responses, and did not follow the appropriate discontinue and reversal rules. For example, in response to the question asking for the commonality between knees and elbows, Diaz answered body parts instead of joints. Dr. Harvey *120 scored this response as zero, while Dr. Gamache stated that Diaz should have been given points for his response. Regarding the WASI administered in 2005 that Dr. Harvey scored as a 76, Dr. Ga-mache testified that Diaz’s score should have been an 81 because of flaws with Dr. Harvey’s scoring.
Further, Dr. Gamache testified that he was troubled by Dr. Harvey not performing any malingering tests on Diaz. Dr. Gamache explained that the malingering tests he administered indicated that Diaz was malingering. For example, Diaz was unable to complete one of Dr. Gamache’s tests, even though it was an easier version of a test that Dr. Harvey had previously administered to Diaz.
In response to Dr. Puente’s testimony, Dr. Gamache questioned the validity of the ABAS-II administered to Minerva Diaz and Jose Diaz, Jr., because their responses indicated that they did not understand the test. The most significant indicator of this was that neither of their score sheets indicated that any of their responses were guesses or that they were unsure of an answer. Dr. Gamache also testified that his review of Minerva’s testimony at the evidentiary hearing indicated that she did not understand the test. Further, Dr. Puente improperly failed to score the first eleven responses on the test that he administered to Minerva, which would have increased the score by thirty-three points.
Dr. Gamache testified that his interviews of Diaz — which were recorded and played in their entirety during the eviden-tiary hearing — and Lissa Shaw indicated that Diaz does not currently suffer from any deficits in adaptive functioning. For example, Dr. Gamache noted that Lissa Shaw related that Diaz once talked his way out of a ticket by telling the police officer that he was his brother Jose.
Lissa Shaw testified on behalf of the State. Her testimony indicated that Diaz did not suffer from any deficits in adaptive functioning during the approximately two years they were dating, which included approximately one year that they lived together. Some of the tasks that Shaw testified about included that Diaz maintained a job the entire time they were together, groomed himself, dressed appropriately, instructed her how to prepare Mexican food to his liking, supervised her young daughter, initiated the conversation when they first met, decided how he would spend his paycheck, gave her money to pay bills, and made the necessary arrangements to obtain housing that they shared.
The postconviction court did not err in denying relief. Under section 921.137(1), Florida Statutes (2009), to prevail on this claim Diaz was required to establish: “(1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen.” Franqui v. State, 59 So.3d 82, 91 (Fla.2011); Cherry v. State, 959 So.2d 702, 711 (Fla.2007). “In Cherry, we held that the language of section 921.137(1) is clear and unambiguous in mandating a strict cut-off IQ score of two standard deviations from the mean score, which is exactly 70.” Franqui, 59 So.3d at 91.
In reviewing the postconviction court’s determination that Diaz is not mentally retarded, “this Court examines the record for whether competent, substantial evidence supports the determination of the trial court.” State v. Herring, 76 So.3d 891, 895 (Fla.2011), cert. denied, _ U.S. _, 133 S.Ct. 28, 183 L.Ed.2d 676 (2012). Further, “this Court has consistently held that in order for a defendant to be exempt from the death penalty based upon a claim of mental retardation, he must bear the burden of establishing all three criteria of *121 the three-prong standard.” Id. “This Court ‘does not reweigh the evidence or second-guess the circuit court’s findings as to the credibility of witnesses.’ ” Id. (quoting Brown v. State, 959 So.2d 146, 149 (Fla.2007)). However, this Court applies a de novo standard of review to the trial court’s determination of questions of law. See id. (citing Cherry, 959 So.2d at 712).
The postconviction court concluded that:
After considering the evidence, the demeanor of the witnesses, and their testimony, the Court finds that the greater weight of the evidence indicates that Defendant does not have subaver-age intellectual functioning, has no currently existing deficits in adaptive functioning, and that there was no onset of either element prior to age 18. Defendant has not met his burden of proving by clear and convincing evidence, or by a preponderance of the evidence, any of the three prongs of the mental retardation definition.
State v. Diaz, No. 97-CF-3305 19 (Fla. 20th Cir. Ct. “Mental Retardation Order” filed Apr. 6, 2011) (Mental Retardation Order) at 19.
The postconviction court’s conclusion that Diaz has failed to establish any of the three prongs of mental retardation is supported by competent, substantial evidence. The court concluded that Diaz did not satisfy the subaverage intellectual functioning prong after reviewing the evidence and making credibility determinations of the witnesses. The court found that Diaz’s score of 57 on the WAIS-IV administered by Dr. Harvey in 2010 was unreliable, due to concerns about the administration and scoring of the IQ test that were addressed by the State during its cross-examination of Dr. Harvey and the testimony of Dr. Gamache. The discredited IQ test was the only “standardized intelligence test authorized by the Department of Children and Family Services in rule 65G^.011 of the Florida Administrative Code” administered to Diaz. See Fla. R.Crim. P. 3.203. Diaz had not previously been identified as mentally retarded on administrations of the WASI, and his scores on standardized tests in school did not indicate his mental retardation.
The postconviction court made similar credibility determinations regarding its conclusion that Diaz failed to satisfy the deficits in the adaptive functioning prong. The court concluded that Dr. Gamache’s finding that Diaz had no deficits in adaptive functioning was more credible than Dr. Puente’s conclusion that he suffered such deficits. The court found that Dr. Puente’s reliance on the ABAS-II test administered to Diaz’s siblings, Jose Diaz, Jr. and Minerva Diaz, was invalid. It noted that on cross-examination, the State demonstrated that Minerva Diaz did not understand how to answer the questions that Dr. Puente asked her about Diaz. Further, Dr. Gamache’s testimony indicated additional flaws with Dr. Puente’s scoring and administration of the test. For example, the first eleven questions of the test administered to Minerva Diaz were not scored, and none of the responses were marked unsure or guess. Lissa Shaw testified that Diaz did not demonstrate any deficits in adaptive functioning during the approximately two years that they dated, which included approximately a year that they lived together. She provided detailed testimony regarding Diaz’s functional abilities, such as his ability to groom himself, dress appropriately, maintain a job the entire time they were together, and make the necessary arrangements for them to lease the trailers in which they lived. Thus, the court’s conclusion that Diaz failed to satisfy the adaptive functioning prong was based on competent, substantial evidence.
*122 Finally, the postconviction court concluded that because Diaz failed to demonstrate deficits in adaptive functioning or subaverage intellectual functioning, the third prong, requiring onset before the age of eighteen, could not be satisfied.
Diaz’s request that this Court second guess the postconviction court’s determinations regarding the credibility of witnesses is contrary to this Court’s case law. See Herring, 76 So.3d at 895; Brown, 959 So.2d at 149. As a result, this Court is required to respect the postconviction court’s determination that Dr. Gamache’s testimony was more credible than that of Dr. Harvey on the subaverage intellectual functioning prong and that Dr. Gamache, Lissa Shaw, the prison employees, and the State’s cross-examination of Minerva Diaz sufficiently undermined the testimony of Dr. Puente and Dr. Dudley on the deficits in adaptive functioning prong.
Because the postconviction court did not err regarding prongs one and two, we need not review its conclusion regarding prong three. Diaz is not entitled to relief on either of his mental retardation related claims.
VII. HABEAS PETITION CLAIMS
In his petition for a writ of habeas corpus, Diaz asserts that: (A) his sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (B) his death sentence is disproportionate, and this Court failed to undertake a meaningful proportionality review on direct appeal; and (C) this Court conducted an improper harmless error analysis on direct appeal. These claims are not cognizable in a petition for habeas relief.
Since the adoption of Criminal Procedure Rule No. 1 in 1963, “habeas corpus may not be used as a substitute for an appropriate motion seeking postconviction relief.” Baker v. State, 878 So.2d 1236, 1241 (Fla.2004) (quoting Harris v. State, 789 So.2d 1114, 1115 (Fla. 1st DCA 2001)). Rule No.1—the predecessor to Florida Rules of Criminal Procedure 3.850 and 3.851 — established a process by which collateral attacks on criminal convictions and sentences may be presented in the trial court that imposed the conviction and sentence. See In re Criminal Procedure, Rule No. 1, 151 So.2d 634, 635 (Fla.1963). In adopting Rule No. 1, this Court explained that the procedure was intended to supplant most uses of the writ of habeas corpus.
An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this rule, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.
Id. Rules 3.850 and 3.851 — which permit initial and, in some circumstances, successive postconviction motions — continue to provide an avenue for litigating most collateral attacks to a conviction or sentence. “Habeas corpus should not be used as a vehicle for presenting issues which should have been raised at trial and on appeal or in postconviction proceedings. The habeas process is therefore most often used in death penalty cases to challenge the effectiveness of appellate counsel.” Wright v. State, 857 So.2d 861, 874 (Fla.2003) (citation omitted).
None of the claims raised by Diaz in his habeas petition are appropriately considered in a petition for a writ of habe-as corpus. Diaz could have raised his challenge to “the constitutionality of Flori *123 da’s sentencing scheme both at trial and on direct appeal.” Evans v. State, 946 So.2d 1, 15 (Fla.2006). Diaz did not raise such a claim on direct appeal. See Diaz, 860 So.2d at 965.
Diaz’s claims that this Court did not conduct an adequate proportionality review on direct appeal and that the Court conducted an improper harmless error review on direct appeal are not cognizable. Habeas proceedings simply do not afford an opportunity to relitigate such claims. Accordingly, Diaz’s habeas claims are not properly presented in a petition for a writ of habeas corpus, and he is not entitled to relief.
VIII. CONCLUSION
For the reasons stated above, we conclude that Diaz is not entitled to postcon-vietion relief from his conviction and sentence for the first-degree murder of Charles Shaw. Accordingly, we affirm the postconviction court’s denial of Diaz’s motion for postconviction relief, we affirm the court’s denial of Diaz’s motion seeking a finding that he is ineligible to be executed due to his mental retardation, and we deny Diaz’s petition for a writ of habeas corpus.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

 some point during the incident, a neighbor walked up to the Shaws’ house. When he approached, both the garage door and the door leading from the garage to the inside of the house were open. The man saw an individual pacing back and forth inside the home, and as he entered the garage, he called out for Charles. Diaz then stepped into the garage, pointed the gun at the man, and said, “Get the f— out of here.” The neighbor returned to his house and called police.

. Spencer v. State, 615 So.2d 688 (Fla.1993).