CANADY, J.,
concurring in part and dissenting in part.
I agree that Bevel’s habeas petition should be denied, but I disagree with the decision to reverse the postconviction court’s order denying relief and to remand for a new penalty phase. I disagree with the majority for three reasons. First, I would conclude that the requirements of Hurst v. Florida, — U.S. —, 136 S.Ct. 616, 193 L.Ed.2d 604 (2016), were satisfied *1186 because the jury unanimously found the existence of an aggravating circumstance as evidenced by its contemporaneous, unanimous verdicts for the murder of the second victim and the attempted murder of the third victim. Second, I adhere to my view that Hurst v. Florida should not be given retroactive application. Lastly, I would conclude that Bevel is not entitled to relief because he failed to establish at least one of the Strickland prongs in each of his ineffective assistance of counsel claims. The postconviction court’s denial of relief should therefore be affirmed.
I.
I adhere to my view that Hurst v. Florida—like Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556. (2002)—only requires that the jury find the existence of an aggravating circumstance that renders a defendant eligible for a death sentence. See Hurst v. State, 202 So.3d 40, 77 (Fla. 2016) (Canady, J., dissenting) (noting, “the Hurst v. Florida Court’s repeated identification of Florida’s failure to require a jury finding of an aggravator as the flaw that renders Florida’s death penalty law unconstitutional”), cert. denied, No. 16-998, — U.S. —, 137 S.Ct. 2161, 198 L.Ed.2d 246, 2017 WL 635999 (U.S. May 22, 2017); see also Hurst v. Florida, 136 S.Ct. at 624 (“Florida’s sentencing scheme, which required the judge alone to find the existence of an aggravating circumstance, is therefore unconstitutional.”). Bevel’s jury did make a unanimous finding regarding the existence of an aggravating circumstance—that Bevel was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person. The jury unanimously determined that this aggravating circumstance was proven beyond a reasonable doubt as reflected in- its separate verdicts finding Bevel guilty, of the contemporaneous first-degree murder of the second victim and of the contemporaneous attempted first-degree murder of the third victim. Thus, I would conclude that no Hurst v. Florida error occurred.
II.
Even if Hurst v. Florida error were present in this case, I would deny Bevel relief. As I have previously explained, Hurst v. Florida should not be given retroactive effect. See Mosley v. State, 209 So.3d 1248, 1285-91 (Fla. 2016) (Canady, J., concurring in part and dissenting in part).
HI.
- I disagree with' the majority’s analysis of Bevel’s ineffective assistance of counsel claims. The'majority summarizes Bevel’s claims as follows: “Bevel argues that his penalty phase counsel was deficient in failing to -conduct a constitutionally adequate mitigation investigation;” Majority op. at 1179. But Bevel actually argues that
counsel provided ineffective assistance in the penalty phase of trial by conducting his mitigation investigation at the “eleventh hour” and failing to discover Mr. Bevel’s organic brain damage, frontal lobe impairment, “extreme emotional disturbance,” “capacity to conform his conduct to the requirements of the law,” sexual abuse, PTSD, depression, anxiety, and other significant mental health and social and environmental mitigation and subsequently hire experts, and present these mitigators to the jury, in violation of Bevel’s Fifth, Sixth, Eighth, and Fourteenth Amendment rights to effective representation, and a fair trial.
Appellant’s Initial. Brief at 56, Bevel v. State, No. 14-770, 2014 WL 5788912 (Fla. Oct. 27, 2014). In my view; Bevel’s claims cannot be lumped into a single ineffective assistance of counsel claim; instead, the allegations should be divided into separate subclaims and analyzed individually. This *1187 is so because counsel may have rendered deficient performance with respect to some of the allegations but not others, and Bevel may have been prejudiced by some of counsel’s actions but not others.
The majority justifies its conclusion that trial counsel rendered deficient performance in the penalty phase as follows:
■ From a review of the evidential^ hearing transcript and the record, it is clear that counsel failed to obtain, or was unaware of, significant records and mitigation evidence that could have assisted in the defense’s penalty phase presentation. Indeed, penalty phase counsel conceded, based on the records postconviction counsel established to have been in existence, that he could have done more to investigate mitigar tion.
These records included, among others, reports from Bevel’s time in foster care, a report that Bevel was the victim of childhood sexual abuse, and records from an attorney who represented Bevel during juvenile proceedings. Obtaining these records, and contacting some of the witnesses who testified in postcon-viction proceedings that were not contacted prior to the trial, would have enabled penalty phase counsel to emphasize the extent of Bevel’s poor living situation with his grandmother, including the dangerous neighborhood plagued by high crime and drugs; the extent of Bevel’s academic and childhood behavioral problems and how he never received the help he needed; and how Bevel was not irredeemable but rather a product of his difficult upbringing, based on his demonstrated behavioral improvement while living with his foster parents.
[[Image here]]
The mental health experts who testified during postconviction proceedings also offered qualitatively, more favorable opinions—a fact the State has conceded. For instance, evidentiary hearing testimony from Dr. Ouaou indicated that Bevel suffers from frontal lobe impairment, a history of traumatic brain injury, and diminished mental capacity. Testimony from Drs. Gold and Dudley indicated that Bevel suffers from depression, Pos1>-Traumatic Stress Disorder, and anxiety. This testimony can be contrasted With Dr. Krop’s penalty phase testimony, as summarized by this Court on direct appeal, that Bevel “had no organic brain damage or other serious mental infirmity, and was not suffering from any mental illness at the time of the crime.”
While a more favorable expert opinion in postconviction [proceedings] generally does not establish deficient performance[] because trial counsel is entitled to rely on the evaluations of qualified mental health experts, it is critical to note that the mental health experts who testified at the evidentiary hearing were provided with additional background information' not previously discovered or provided to Dr. Krop—that is, the very records' and information penalty phase counsel failed td discover. In fact, Dr. Ouaou 'testified that' some of these records were “key” in forming his opinion.
Majority op. at 1180 (citations omitted).
The only records identified by the majority that trial counsel “failed to obtain, or was unaware of,” aré “reports from Bevel’s time in foster care, a report that Bevel was the victim of childhood sexual abuse, and records from an attorney [ (Laurel French Wilson) ] who represented Bevel during juvenile [délinquency] proceedings.” Majority op, at 1180,
The records referred to by the majority as “foster care” records are not records from a time when Bevel was in foster care through the Department of Children and *1188 Families Services or its predecessor agency, the Department of Health and Rehabilitative Services (HRS); they are actually from a time when Bevel was adjudicated delinquent and committed to a residential program in the Department of Juvenile Justice (DJJ). According to the record, after a judge committed Bevel to DJJ in 1994, he “was admitted to the White Foundation Individual Family Treatment Home Program.” So instead of being sent to a typical DJJ program in a camp-like or prison-like setting, he was sent to live with a “foster” family, the Sardinas, on August 8,1994.
These records[7] indicate that while Bevel initially had a tough time when living with the Sardinas, his behavior and grades eventually improved and he completed the program satisfactorily. The records show that Bevel was with the Sardinas for six months but only reached the upper level of improvement during the final month.
Postconviction counsel provided these records to postconviction expert Dr. Gold, who relied on them to conclude that Bevel does not have Antisocial Personality Disorder (ASPD)—which Dr. Krop testified at the penalty phase Bevel does have—because ASPD is an enduring pattern of behavior, but when Bevel was with the Sardinas, his grades and behavior improved.
Laurel French Wilson, an attorney who represented Bevel on one occasion when he was twelve years old and charged with possession of cocaine with intent to sell, grand theft, criminal mischief, and a violation of community control, provided her file to postconviction counsel. In pertinent part, the file contains a “Child Guidance Center Psychosocial Evaluation Interview” form, which was based on an interview of Bevel, conducted on March 25, 1994. The referral source was HRS, but the report indicates that there was no HRS involvement. Ms. Wilson testified at the evidentia-ry hearing that the evaluation was done by a school guidance counselor. Trial counsel testified that he did not recall having reviewed this document.
The evaluation interview form indicates that- at the time of the interview, Bevel’s peer relations, family relations, and communication skills were good and that his psychosexual functioning was appropriate. He dénied previous or current abuse of himself, his mother, father, and siblings. He was in “regular class” and had not repeated any grade levels. His mother was killed in a car accident in May 1993, and at the time of the interview, Bevel was living with his grandmother and having sporadic contact with his father. He was dressed appropriately, his activity level in the interview was appropriate, he was cooperative, and he was oriented in all three spheres. His mood, affect, speech, sleep, and eating habits were normal. His thought processes were rational in content and form. His thought organization was logical- His insight was realistic. His judgment was limited. His emotional tone seemed normal. He accepted responsibility for his behaviors. He was on probation for an assault he denied committing. He was sent to a different school due to numerous referrals for disrupting class. The evaluation interview form listed Oppositional Defiant Disorder (ODD) as an Axis I DSM diagnosis and a medical ICD-9-CM diagnosis. Bevel now argues that counsel rendered ineffective assistance in failing to learn he was diagnosed with ODD and present that fact as mitigation at the penalty phase.
During the penalty phase, Dr. Krop— with express agreement from Bevel after *1189 consultation with his attorneys—testified about Bevel’s ASPD diagnosis. Dr.-Krop also testified that Bevel probably had Attention Deficit Hyperactivity Disorder (ADHD), that he had been recommended for treatment for Post-Traumatic Stress Disorder (PTSD), that his intellectual ability was in the mildly - mentally retarded range, that he had cognitive deficits, that he had behavioral problems in school, that he was depressed at times, that he did not have good coping skills, that he turned to drugs and crime at a young age, that he was living in the streets at a young age, that his mother’s drinking during her pregnancy with him affected his intellect, that his judgment was almost totally compromised at various times in his life, and that he progressed fairly well when he was placed in structured environments, including DJJ commitment programs. Dr. Krop also testified at the penalty phase that he reviewed records regarding Bevel’s involvement with DJJ (which started when Bevel was rather young), including predisposition reports and psychological evaluations.
With regard to Bevel’s claim that counsel was ineffective for failing to obtain “reports from Bevel’s time in foster care,” Bevel failed to establish that counsel rendered deficient performance. There was no evidence presented at the evidentiary hearing that trial counsel failed to review these records in preparation for the penalty phase. When asked whether he reviewed the records from Bevel’s time with the Sardinas, counsel responded, “I don’t recall specifically. Again, I turned over the file to you. If it was there, then I had them obviously.” Trial counsel did recall speaking to the Sardinas in the course of preparing for the penalty phase. Trial counsel specifically recalled that Mr. Sardina told him that when Bevel was living with the Sardinas he was able to follow the rules, obey authority, not commit any crimes and that he did better in school, was a good boy, and was doing well.
Bevel asserts that the' point of the records was to show that he does better in structured environments and therefore does not have ASPD. But Dr. Krop was aware, and even testified at the penalty phase, that Bevel does better in structured environments, yet he still found that Bevel met the criteria for ASPD. Dr. Krop testified at the penalty phase that for Bevel, “structured programs as a juvenile and the jail [as an adult] are actually healthier environments for him and he does not exhibit the antisocial behavior [in those environments], he only exhibits the antisocial behavior when he’s in the community.” Dr. Krop also specifically discussed Bevel’s time with the Sardinas at the penalty phase. The State asked Dr. Krop, “Didn’t [Bevel] have a problem with disrupting his peers in class and wasn’t he suspected for certain things [when he was with the Sar-dinas]?” Dr. Krop responded,
He would typically, yes, he would typically have problems when, he would start in one of the programs and then he would tend to do better.
If you looked at the progress reports in each of the individual programs that he was in it would pretty much be a similar pattern.
The records from when Bevel was with the Sardinas were indeed progress reports from one of the programs to' which Bevel was committed as a juvenile. Thus, Dr. Krop’s testimony at the penalty phase established that he had these records at the time of the penalty phase; he either obtained them on his own or was provided them by trial counsel, who simply did not remember having done so by the time of the evidentiary hearing. Further, contrary to Bevel’s assertion and Dr. Gold’s testimony, these records do not prove that Bevel does not have ASPD. These records *1190 were compiled when Bevel was thirteen years old, but, as the. experts testified, one of the requirements for an ASPD diagnosis is a pervasive pattern of disregard for and violation of the rights of others since the age of fifteen. Even if we were to ignore the evidence which establishes that Dr. Krop was provided with these records pri- or to the penalty phase and assume that trial counsel rendered deficient performance by failing to obtain and provide them to Dr. Krop, because Dr. Krop did testify at the penalty phase that Bevel does better in a structured environment and because the record's would not have precluded Dr. Krop from diagnosing Bevel with ASPD, Bevel has not established prejudice.
With regard to Bevel’s claim that counsel was deficient for failing to obtain Ms. Wilson’s file—specifically, the March 25, 1994, “Child Guidance Center Psychosocial Evaluation Interview” form, which was the only relevant item in the file—Bevel has not established deficiency. It was not per se unreasonable under prevailing professional norms for counsel to not obtain or attempt to obtain all of the files from all of the defense, attorneys who handled each of Bevel’s twenty-one referrals[8] .to DJJ. Most of them almost certainly had been destroyed or discarded. It was just by happenchance that Ms. Wilson retained her file for many years.
Moreover, there was no evidence, presented to establish that trial counsel did not review the March 25, 1994, evaluation interview form. Trial counsel testified at the evidentiary hearing only that he did “not specifically recall seeing that document.” And Dr. Krop was not asked whether he reviewed this document or whether having been aware that Bevel was diagnosed with ODD at the age of twelve would have changed his opinions in any way. In any event, as previously explained, Bevel’s ODD diagnosis 'at the age of twelve would not have precluded a subsequent diagnosis of ASPD. Thus, Bevel has not established that he was prejudiced by counsel’s failure to obtain Ms. Wilson’s file. Further, although Bevel complains that trial counsel did not call an expert to testify about his ODD diagnosis at the penalty phase, even one of his own postconviction experts, 'Dr. Dudley, testified at the evi-dentiary hearing that he disagreed with the diagnosis. The totality of the evidence regarding Bevel’s ODD diagnosis is therefore that the diagnosis is disputed. Any mitigation provided- by such disputed evidence would have been minimal at best.
The report relating to Bevel being a victim of sexual abuse as a child indicates that in 1987, a six-year-old male victim and a three-year-old' female victim were sexually battered by a juvenile relative. The male was apparently Bevel, and the female was his sister. The report states that a juvenile cousin performed oral sex on Bevel and tried to get Bevel to reciprocate, but Bevel resisted. Other family members in the house at the time denied that this incident could have happened because at the time it allegedly occurred, there were five children (including two children who were “older”) playing together and the adults were nearby and checking on the children periodically. Despite these denials, there was physical evidence that the three-year-old was digitally penetrated as- she claimed, and the juvenile cousin was arrested. Whether he was charged with or convicted of a crime against Bevel- is unknown. -
A friend and coworker of Bevel’s deceased mother testified at the evidentiary hearing that Bevel’s mother 'told him that Bevel was sexually abused by a family member when he was a young boy—appar *1191 ently in reference to the incident described above. According to the coworker friend, Bevel’s mother told him that she talked to Bevel about the abuse but did not get him any therapy. Bevel has repeatedly denied that the incident occurred, even during the postconviction proceedings. There is no evidence that this abuse was anything other than an isolated incident.
The abuse report was noted in a chronology of Bevel’s life prepared by predecessor trial counsel, Alan Chipperfield, which included the allegation of abuse and stated that “the report of abuse was ‘closed without classification with ongoing services provided by a non-HRS agency.’ ” Trial counsel testified at the evidentiary hearing that he reviewed Chipperfield’s chronology in preparation for the penalty phase. When asked at the evidentiary hearing whether he was “aware that there is a 1987 abuse registry report that has Bevel listed as a victim of sexual abuse,” trial counsel stated, “I don’t recall.” Because there is evidence that Chipperfield either obtained the report or was at least aware of its contents and no evidence that trial counsel did not have the report, we cannot draw the conclusion that trial counsel was deficient simply for failing to discover this report. Nor can we conclude that trial • counsel’s performance was deficient for failing to discover the sexual abuse allegations by speaking with Bevel’s deceased mother’s coworker friend.
Even assuming that trial ■ counsel performed deficiently by failing to offer the evidence of sexual abuse as mitigation, Bevel is not entitled to relief because he has not established that he was prejudiced by counsel’s failure. The fact that the jury did not hear that Bevel may have been abused on one occasion by a juvenile cousin does not undermine confidence in the outcome in this case, a double—nearly a triple—homicide, in which one of the victims Bevel executed was a child. Moreover, because Bevel continues to deny this incident occurred, the presentation of the allegations in the report at a new penalty phase would likely be rebutted by testimony that Bevel and his family members deny that any abuse occurred and would therefore have little, if any, mitigating value.
It appears that thé majority has also found that trial counsel was'ineffective because while the postconviction experts testified that Bevel suffers from frontal lobe impairment, a history of traumatic brain injury, diminished mental capacity, depression, PTSD, and anxiety, Dr. Krop did not offer the same opinions at the penalty phase. The majority notes that more favorable expert opinions in postconviction proceedings generally do not establish deficient performance because trial counsel is entitled to rely on the evaluations of qualified mental health experts, but it nonetheless concludes that trial counsel was deficient for failing to provide Dr. Krop with records and “additional background information not previously discovered,” some of which were “ ‘key’ ” for one of the postcon-viction experts, Dr. Ouaou, in forming his opinion. Majority op. at 1180.
The majority does not indicate which records or background information it believes should have been, but were not, provided to Dr. Krop. And there is ,no evidence in the record that- any of the postconviction experts had any records or background information that Dr. Krop did not. The only arguable support for the majority’s finding is that when postconviction expert Dr. Ouaou was asked at the evidentiary hearing, “[W]as Dr. Krop provided all of the records, bench notes, school records that you have?” and Dr, Ouaou replied, “It’s my impression that he was not, and some of those were key, I believe, in forming my opinion.” Dr. Ouaou gave no explanation for his “impression” *1192 that Dr. Krop did not have all the same records that he was provided.
We cannot rely on Dr. Ouaou’s “impression” to conclude that trial counsel rendered deficient performance. Moreover, the majority appears to speculate that had Dr. Krop been furnished with whichever records and background information the majority has found he was not provided, he would not have testified at the penalty phase that Bevel “had no organic brain damage or other serious mental infirmity, and was not suffering from any mental illness at the time of the crime,” majority op. at 1180 (quoting Bevel v. State, 983 So.2d 505, 513 (Fla. 2008)), and instead would have offered opinions similar to those of the postconviction experts. But even assuming that there were “key” records and background information with which Dr. Krop was not provided, there was no evidence presented at the eviden-tiary hearing that had Dr. Krop been provided with those records and background information, he would have changed his opinions and offered different testimony at the penalty phase.
Further, even though Dr. Ouaou opined at the evidentiary hearing that Bevel’s capacity to conform his conduct to the requirements of the law was substantially impaired at the time of the murders due to frontal lobe dysfunction—which Dr. Ouaou said might have been caused by a traumatic brain injury that might have occurred when Bevel was hit in the head as a child or as a result of Bevel’s mother’s drinking while she was pregnant with him—he stated that his diagnosis was only “hypothetical” without brain imaging, which was not done. Dr. Ouaou further stated that it is possible that Bevel’s actions in committing the murders were due to ASPD rather than brain damage. Thus, the evidence presented at the evidentiary hearing that Bevel suffers from brain damage is tenuous at best. Bevel’s claim is nothing more than a claim that trial counsel did not find the most favorable experts, which is a claim that we have repeatedly rejected. See Brant v. State, 197 So.3d 1051, 1069 (Fla. 2016) (“[W]e have repeatedly stated that trial counsel is not deficient because the defendant is able to find postconviction experts that reach different and more favorable conclusions than the experts consulted by trial counsel.” (citing e.g., Diaz v. State, 132 So.3d 93, 113 (Fla. 2013); Wyatt v. State, 78 So.3d 512, 533 (Fla. 2011); Asay v. State, 769 So.2d 974, 986 (Fla. 2000))). I would therefore conclude that Bevel is not entitled to relief because he has not established that counsel’s performance was deficient.
Regarding Bevel’s childhood, the majority states:
Obtaining these records,[9] and contacting some of the witnesses who testified in postconviction proceedings that were not contacted prior to. the trial, would have enabled penalty phase counsel to emphasize the extent of Bevel’s poor living situation with his grandmother, including the dangerous neighborhood plagued by high crime and drugs; the extent of Bevel’s academic and childhood behavioral problems and how he never received the help he needed; and how Bevel was not irredeemable but rather a product of his difficult upbringing, based on his demonstrated behavioral improvement while living with his foster parents.
There is little doubt that the quality and depth of the postconviction evidence painted a more complete and troubling *1193 picture of Bevel’s background than was presented to the jury and the trial court—something postconviction counsel was -able to uncover primarily due to the extensive investigation undertaken by mitigation specialist Sara Flynn,
majority op. at 1180, and “Bevel offered a more compelling picture of a ‘poor childhood’ during the postconviction proceedings,” majority op. at 1182. But without identifying any records that trial counsel did not have or specifying the witnesses that trial counsel was deficient for failing to interview, the mere fact that trial counsel could have “emphasized the extent of’ or “offered a more compelling picture of’ Bevel’s “poor childhood” does not necessarily render his performance deficient.
Further, Bevel has not established that he was prejudiced by counsel’s presentation of the circumstances of his childhood. This Court summarized some of the evidence presented by Bevel during the penalty phase as follows:
In defense, Bevel presented the testimony of several family members who described Bevel’s poor childhood, the physical abuse he suffered and witnessed at the hands of his mother’s boyfriend, the bond he held with his mother and how her death affected him at the age of twelve, his poor relationship with his father who was a heroin addict, and his positive relationships with his extended family.
Bevel, 983 So.2d at 512. Other evidence presented in mitigation at the penalty phase included the following: Bevel’s mother had alcoholism and drank heavily while pregnant with Bevel; there was domestic violence between Bevel’s mother and father, including an incident during which Bevel’s mother stabbed Bevel’s father in the chest; Bevel’s father abandoned him, tried to commit suicide, and died of complications from AIDS; the odds were against Bevel his whole life; Bevel received no counseling regarding his-'mother’s tragic and untimely death; Bevel’s mother’s boyfriend verbally and physically abused Bevel, his mother, and his sister, and, more specifically, that he would get drunk, and beat them, sometimes with a belt, and one time he kicked Bevel so hard that Bevel could not breathe and had to be taken to- the hospital; Bevel’s mother would go to the bar and leave Bevel with the abusive boyfriend; Bevel had bad grades, behavior problems, and probably ADHD; Bevel should have been in special education; Bevel had no positive male role model and turned to living in the streets, using and selling drugs, and a life of crime at a young age; Bevel was often depressed because he was not taught adequate coping skills; Bevel’s judgment was almost totally compromised at various times in his life; Bevel was suspicious of- others because when he let down his guard one time, he was shot; Bevel progressed fairly well when in structured environments; a criminal element was present everywhere in Bevel’s environment and that was the modeling that he was exposed to; and Bevel never received counseling for PTSD, which was always recommended.
The majority states that through the extensive investigation undertaken by mitigation specialist Sara Flynn in preparation for the postconviction proceedings, post-conviction counsel was able to uncover evidence that painted a more complete and troubling picture of Bevel’s background than was presented during Bevel’s penalty phase and sentencing proceedings. At the evidentiary hearing, Flynn was asked, “[W]hat mitigating factors would you have given defense counsel?” Flynn responded • that she would have provided trial counsel with: the different types of abuse Bevel endured and was exposed to; the genealogical factors; the substance abuse; the fact that Bevel was sexually exploited in the neighborhood where he grew up; that *1194 Bevel had been sexually abused as a young boy; that there was nobody to protect Bevel from males in the neighborhood who were exploiting him; that Bevel had depression and- PTSD, which were not treated other than by his use of marijuana; that Bevel started using marijuana when he was -twelve years old; and that Bevel received head injuries. Most of the mitigating factors that Flynn described are cumulative, to the mitigation presented at the penalty phase. The only items in her.list that were noncumulative are the sexual abuse, which was previously discussed, “the genealogical factors,” and .the fact that Bevel was sexually exploited in the neighborhood,
The only “genealogical factor” -that Flynn mentioned at the evidentiary hearing was the fact that Bevel’s. mother -was stabbed by her first husband, years before Bevel was born, which caused her to start drinking. But other witnesses testified that Bevel’s mother began drinking because her second husband, Bevel’s father, was using heroin. And one witness even testified that Bevel’s mother started drinking just after high school. Even.assuming that being stabbed by her first husband triggered Bevel’s mother’s drinking, that fact is not relevant or mitigating. Trial counsel presented evidence at the penalty phase that Bevel’s mother drank while she, was pregnant with Bevel and, during, Bevel’s childhood. That information was mitigating but what might have triggered her. drinking years before Bevel was born was not. Counsel was not deficient for failing.to discover or present evidence that Bevel’s mother was stabbed, nor was Bevel prejudiced by the absence of this “genealogical factor” at his penalty phase.
As to Flynn’s assertion that Bevel was sexually exploited in his neighborhood, Flynn testified that she learned that victim Stringfield would recruit young men., to drive him around town because he was an alcoholic and did not want to get charged with DUI, but he was also a drug dealer and needed transportation to conduct his dealings. Flynn said Stringfield “did not pay [the young men] anything; but gave them privileges, and used them for his own sexual pleasure. And he also did the same thing with females.” But Flynn did .not provide any basis for this knowledge nor did she say that this happened to Bevel, When asked on cross-examination whether Bevel reported being sexually abused by Stringfield, Flynn said, “He did not deny it or admit it.” Counsel-was not deficient for failing to discover from an unnamed source that Stringfield exploited boys and girls in the neighborhood. And because the bad character of a victim is not mitigating, there was no prejudice to Bevel.
Lastly, I would point out that although the majority states that trial counsel’s billing records reflect that he spent “a total of 15.5 to 16.5 hours on the mitigation investigation in Bevel’s case,”' majority op. at 1180, these numbers fail to take into account any of the work done by predecessor counsel. Alan Chipperfield’s chronology shows that a much more thorough mitigation investigation was done than is accounted for by the majority.
In addition to denying Bevel habeas relief, for the reasons explained above, I would also affirm the trial court’s order denying postconviction relief and conclude that Bevel is not entitled to Hurst relief.
POLSTON, J., concurs.

. The parties have referred to these records alternatively as foster care records, records from the Sardinas, and records from the White Foundation.

.' - A referral to DJJ is made when a juvenile is charged with a crime in Florida. It is similar to an arrest in the adult criminal justice system.. ,

. This reference refers generically to the "foster care” records, the sexual abuse report, Ms. Wilson’s juvenile file, and "other” records, which the majority has not identified. Again, the record does not establish that trial counsel did not have the documents that are identified.